Good morning, Your Honors. May it please the Court. I'm Alison Clare on behalf of the appellant, Mr. Watts, and I'll reserve two minutes for rebuttal. Your Honors, Matthew Watts had three very pressing concerns during the period of time that included his crimes, his conviction, and his prosecution and conviction. Those were first, to have a surveillance camera removed from his eye. Second, to be recognized as royalty and defeat those who were trying to keep him from the throne. And third, to end what he called the game, the conspiracy of fake reality that surrounded him. Now, if those concerns had been independent of Mr. Watts' understanding of the proceedings against him, we wouldn't be here to talk about his competence. But the record from the trial court is replete with evidence that in Mr. Watts' own mind, the criminal proceedings were intricately related to his prospects for getting rid of the camera, ascending to the throne, and ending the game. And that's why he was incompetent under Dusky, and why the State Court's contrary findings were objectively unreasonable. You issued an order yesterday asking us to come prepared to discuss Maxwell v. Roe, so I'd like to start there. As my 28J letter indicated, Maxwell is strong support for our second claim under Pate, addressing the issue of whether the trial court ought to have held a second competence hearing. And Maxwell doesn't break any new ground on the Pate claim. In fact, it reaffirms the principles articulated in Torres v. Prunty on which we've relied in the briefs. Both in Torres and in Maxwell, this Court granted relief under AEDPA standards on a Pate claim where the trial court, as in this case, had made an early conclusion that the defendant was malingering rather than genuinely suffering from delusions. And in both cases, a panel of this Court held that the failure to declare a doubt and hold a second proceeding in light of a growing body of evidence of the defendant's irrationality was objectively unreasonable. Okay, well, where is that here? Supposing that the trial judge's original competency determination was well enough supported. Then you went to trial, and in the meantime, Watts said he was lying, and some other things which indicated that the ruling was not So you go to trial, and he repeats the same thing that you have just said, the camera in the eye, the royalty in the game. What about the trial, in your judgment, triggered an obligation for a second competency hearing such that the court's determination is contrary to clearly established law? Judge Rimer, your question actually raises two related issues for me. One is what we are to make of the purported admission of malingering, and the other is the independent evidence that was continuing to grow up until the time of trial. So I'll address them in that order. It's important when looking at what happened on the day that Mr. Watts claimed to have been faking his symptoms, that his goal at that point was to withdraw his NGI plea. He understood at that point that a finding of not guilty by reason of insanity would result in his hospitalization and medication, which he wished to avoid at all costs. And he had learned in the competency proceeding, where he also had that same goal of avoiding being hospitalized, that what persuaded the judge to find him competent, and therefore would likely persuade the judge again to let him withdraw his NGI plea, was following Dr. Delaporta's line that he was faking. And that context Doesn't that just go to show that he understood that game? Well, I mean, he may be crazy in one sense, but just being crazy or deranged or delusional is not necessarily the same thing as not knowing enough about what's going on to be able to deal with your trial. I agree with you that it doesn't necessarily generate that conclusion. But as Dr. Taylor and Dr. Zimmerman recognized, and as this Court has recognized in a variety of mental health contexts, mental illness is not all or nothing. And people who are mentally ill and incompetent can follow some things that are going on. And in this case, I think what is significant is that even after Mr. Watts succeeded in achieving his goal of getting the NGI defense removed from the table, he very quickly reverted to his original symptomatology. He was not able to continue to suppress it, consistent with his own profession that he had been faking. The very next court appearance, he refused to come to court, and his lawyer said, we were down at the jail, and Mr. Watts was talking again about the King of England. And he's begun implicating the Court, and this was new information, in his delusional conspiracies. It was after Mr. Watts' supposed admission that his lawyer for the first time came to court and said, based on my history of interactions with the defendant, I've got to tell you, Judge, we can't have a rational conversation about his defense. I can't represent him. And that constitutes new information, contrary to what the California court of appeals said about there being no new data, because the original competence hearing was called for at arraignment. The doubt was declared and proceedings were suspended at arraignment based on Mr. Watts' presentation in court. Trial counsel had just been appointed, and it had no opportunity at that time for extended conversations with his client in order to assess for himself whether the defendant could assist rationally in the defense, which is essential, of course, to competence. So it was only later, closer to trial, that the lawyer came back and said, notwithstanding your finding of competence, notwithstanding what Mr. Watts said the last time we were in court, I cannot rationally communicate here. We also had, in the interim, a second report from Dr. Zimmerman. And here again, the California court of appeal makes a flat-out factual error when they say that there was nothing new in Dr. Zimmerman's report. He had interviewed Mr. Watts a second time following the competence hearing. It was in September, and that report is attached to the November report. It was a third visit that Mr. Watts had refused, but Dr. Zimmerman had additional information since the competence hearing that Mr. Watts had continued to deteriorate. His symptoms were becoming more flagrant. That was all before the Court when it had not been previously. So that I'll have some time for rebuttal, I do want to say one more important thing about Maxwell, because I think it's clear to anyone who reads the opinion that Mr. Maxwell's symptoms were extremely flagrant. He attempted suicide, which Mr. Watts did not. He had to be placed in a stun belt because he was so disruptive. And I anticipate that Mr. Eldridge will say, well, Maxwell doesn't help Mr. Watts because Mr. Maxwell's disruptive behavior was so extreme. Okay.  And I think it's important to remember a very different case in which this Court granted relief on a paid claim. That would be Odle v. Woodford, which we cite in the briefs. And in Odle, the defendant was completely calm. He was docile in court. And Chief Judge Kaczynski pointed out that passivity or docility in court should not lull a trial judge into assuming that someone is competent. The reality is that neither a cooperative defendant nor a violently disruptive one is necessarily incompetent. The question is the rationality of the understanding. And in this case, unlike either Odle on the one hand or Maxwell on the other, we've got an extensive record of the defendant's delusions directly affecting his litigation decisions. I know you do want to reserve some time. I just do have one quick question. What is his situation today? He filed this petition pro se, as I understand it, and obviously he's well-represented  Has he been medicated? What's his current situation? He is incarcerated at Pleasant Valley State Prison in Coalinga. He has refused psychotropic medication. He is normally housed in ADSEG because of his inability to get along with staff or other inmates. And his condition when he filed the petition was similar? I believe so. He received assistance both from family members and from inmate writers in preparing his pro per submissions. Thank you. Thank you, Your Honor. Good morning, Your Honors. David Andrew Eldridge, Deputy Attorney General for Respondent. I point out that Odle V. Woodford was a case that came down before the Ninth Circuit stopped using the clear error standard that had been previously announced, I believe, in Van Tran. The Supreme Court since then pointed out that clear error won't do. It has to be unreasonable. So relying on a case that old for the actual underlying standard, well, it's no longer good law. I don't think that Maxwell adds anything at all, not simply because Maxwell was more severe, although I don't want to indicate agreement with Maxwell, but also because severity, even if it is not simply a legal, even if someone can be incompetent and yet not displaying severe symptoms, that does not mean that severity of symptoms is irrelevant to the reasonableness of the State court's determination. There is little reason to doubt that Mr. Watts had some mental issues. In fact, I think the sentencing transcript reflects the court reached the same conclusion, that there's some mental illness. I think the court even used it as a factor in mitigation. But what is strikingly clear is that counsel, first of all, is wrong to say that Mr. Watts could not continue, if you will, faking competence. What is clear is that, for example, in tab 15 of the excerpt's record at October 22nd, 2003, where he does admit it was a ploy, that he was trying to get out of the situation, which by the way, even being able to explain that this is a situation which I might avoid by pretending to be crazy, shows a rational comprehension of the proceedings. It shows a goal-oriented ability to engage in behavior you think will advance his circumstances in a court of law. He doesn't have to understand the best strategy in order to do so, but he did understand what was going on and he was engaging in a tactic to try to get out of it. You can't fake mental illness as a means of avoiding prosecution if you don't understand what prosecution is. Also on November 25, 2003, tab 12 in the excerpt's record, he again makes another admission that he was malignant. He says he's never been crazy. At all times, he's been sane. Then, and I think more directly specifically pages 973 and also 974, which are in tab 12, but more critically, and I'm afraid they're jumping around because the tabs aren't in chronological order, you'll see, for example, at tab 10 where he's constantly interrupting and volunteering things, none of that continues at the sentencing phase, which is at tab 8, which, you know, all of these, of course, the court of appeal had the entire transcript before it when evaluating his sanity. I'm sorry, confidence. Not a single withdraw statement at sentencing hearing. Not one. He is asked questions. He answers them precisely and concisely. He doesn't interrupt. He doesn't volunteer anything about cameras. He doesn't volunteer anything about kings or princes. All he does is, you know, if he had been incompetent, if these were true symptoms, there's no reason for these to stop at the sentencing hearing. A person who doesn't understand the proceedings in a rational manner has no reason to change his behavior at sentencing. A person who does, who rationally understands the game has been lost, I'm going to be sentenced now, there's really nothing more to talk about, has every reason to stop acting crazy, which is exactly what he did. I really have no further affirmative points, but I'd be happy to answer any questions you want. The court, what I was looking for, I've lost my place on it. As I understand, the court, in rendering its verdict, acknowledged that his mental illness actually played a role in his criminal conduct. Right. The court said that Mr. Watts' reason for doing what he did is delusional, and he did form the specific intent. It's goal-oriented behavior, but remember one of his goals was to get the camera out of his head. And he also made the point that, or the court also made the point that his reasons are delusional. That, well, that actually doesn't go to confidence in trial, of course. That's a prior date. That was part of his verdict, if I'm not mistaken. Your Honor, when I say he was delusional, when the court's speaking to delusions, they're talking about the conduct itself, not his, not being in trial. True. So insanity at the time of the offense is quite distinct from being competent at the time you're answering for it. So that is the distinction the court made. So you say he was delusional enough to create the crime, but by the time he got to trial he wasn't delusional enough to have it affect his behavior in court. Well, delusion may often have zero effect on your ability to understand proceedings. If I happen to think I'm the Attorney General of the United States, and I think you're disrespecting me and I shoot you, I have a delusion, but it doesn't change the fact that I had all the elements necessary for the crime, which was to kill you with no good reason. So I may have delusions. That does not mean I can't commit the crime, and it doesn't mean that when I get to court and I'm tried for it I don't understand what the proceedings are. To the contrary, they're about the fact that I killed you because of an unreasonable belief I had that I was the Attorney General. Oh, actually, I do need to make one more point. I've made a debrief just to emphasize. Again, every claim of factual error here, by the way, tends to make this unexhausted because the way you exhaust a claim is you present it to the California Supreme Court, and if you don't do a petition for rehearing saying that the Court of Appeal got the facts wrong in any material manner, you cannot change them and you cannot say to the Supreme Court somehow they're different. You can't say to this court for the first time, for example, or even the district court that the Court of Appeal's factual discussion is erroneous. You must tell the Court of Appeal itself in California that there's a problem and so that court can have a chance to fix it. If you do not do that, the California Supreme Court will not consider the claims. Right. But didn't the State, in fact, concede a couple things? The State conceded exhaustion in this case. I don't think we're talking about a different claim to be presented to the California Supreme Court, maybe additional facts, but it's claims that have to be exhausted, not facts. Well, except the problem, Your Honor, is that a claim is a statement of historical facts with a legal argument as to what should follow from those historical facts. So there's no distinction between facts and claims for this purpose? Well, actually, facts are included in a claim, and therefore you cannot exhaust the claim without asserting the material operative facts. Okay. If there's a concession that any added facts are immaterial, then again we can simply rely on the Court of Appeal opinion as any recitation of facts. If it's necessary to go beyond that, if something material to your understanding has to be added, then you have a different claim. As I understand the counsel, the argument is that the trial judge or, excuse me, the Court of Appeal mistakenly assumed that there was no new information brought forward to the trial judge at trial, when in fact there was new information. Dr. Zimmerman had rebutted Della Porta's findings, and apparently there was this fact of counsel. But in any event, there was new information. You're saying that because that wasn't pointed out to the Court of Appeal after it rendered its decision and brought before the California Supreme Court, we can't take that? I am certainly saying that. Okay. Further, Your Honor, had there been a petitioner hearing, the California Court of Appeal might have explained, well, of course we considered that. When we say new evidence, we don't mean there was nothing new that was material. The California Supreme Court would have said that? The California Court of Appeal had offered the chance to explain if there was a statement, if there was an argument that somehow he misstated the facts. They might as well have explained, well, obviously there's new data every time you observe the defendant. Every time you see he comes in and, yes, he's still acting sane. But that's more than new data. I mean, it was the fact that Zimmerman had a new report. Well, Your Honor, that's still just new data. That's new data. You may find it to be more important than watching the defendant. But the court, the trial court might in fact find what's most important is not seeing whether or not a defense-hired or a defense-oriented expert will come up with something new, but rather I'm looking at him every day, and he seems to be able to act sane. That's new data that's constantly coming in. The Court of Appeal doesn't mention that either because, of course — We're not talking about what the trial judge said. We're trying to find out what the Court of Appeal, the last reasoned decision, said. And the California Court of Appeal, in determining if there was any new evidence, they very well might have explained, had there been a petition for a hearing, that, of course, every day brings new evidence. All right. It may be in the form of an expert opinion. It may be in the form of observing the defendant. But he had an obligation to call out a factual error on a petition for a re-hearing. Having not done so, he's waived the claim. Or a perceived error, because I don't think the California Court of Appeal was wrong. Okay. Thank you. Your Honors, I believe my reply brief adequately rebutts that last argument. I would simply add to what is there that while reliance on additional extra record facts raises an issue of exhaustion, at least, we've only ever in the State courts and in Federal courts relied on the record of the State court proceedings that was before the California Court of Appeal. And in no case of this Court's ad pejoris prudence has the theory forwarded by Mr. Watson.  by Mr. Watson. The Court has not adopted or even entertained. In Maxwell v. Roe and in Torres v. Prunty, the Court went back to the record of what happened in the trial court and addressed it directly, and we've simply done the same. Well, he may be thinking he'll get that rule instated elsewhere, but who knows? This Court has said repeatedly that when a bona fide doubt is raised by additional evidence, even when there's been a prior finding of competence, even when in Maxwell v. Roe four out of five experts previously opined that the defendant had been malingering, nonetheless, when there's new evidence of incompetence, the fact that there might also be evidence from which one could conclude that competence continued, such as failure to speak up at a sentencing hearing, you can't resolve that without having a hearing and hearing from the doctors. We all have questions about what does it mean about Mr. Watts' competence that sometimes he was manifesting his delusions very openly and other times he was silent. Some things he seemed able to reason about, others not. We are not mental health professionals, and I would say that we are not qualified to make those decisions without hearing from the professionals. And what needed to happen no later than December 10th, the day of trial, when Mr. Watts first started to enter a plea and explained he was doing so because his status legally as guilty or innocent would determine the status of his camera and because the outcome of the trial would determine the outcome of the game, what the Court needed to do was say, time out. I've never had Dr. Zimmerman here in front of me to answer my questions about his malingering theory. I've not had the chance to talk to Dr. Taylor about why he rejects Dr. Delaporte's malingering theory. That hearing had to have happened so that the questions that you all have about Mr. Watts' competence could have been answered based on expert mental health testimony. Thank you.
judges: Pallmeyer, Rymer, Fisher